market has remained focused on price erosion for the [Company's] base generics business."  Other analysts were concerned his departure suggested that there may be something "going on internally in the generics business" that had not been disclosed.  (Citi analyst question at December 8, 2016 Citi Global Healthcare Conference; Piper Jaffray analyst report on December 6, 2016).

723.    As a result of this new negative information, on the next trading day, Teva's ADS price fell $2.01 per share, or 5.43%, from a close of $37.04 on December 5, 2016 to a close of $35.03 on December 6, 2016, on high trading volume.  The ordinary share price also declined ILS 690, or 4.91%, from a close of ILS 14,050 on December 5, 2016 to a close of ILS 13,360 on December 6, 2016.  Teva's market capitalization was reduced by approximately $1.84 billion.

### 5.    December 14, 2016

724.    During trading on the NYSE on December 14, 2016, the DOJ announced in a press release that it had charged (by information) Glazer and Malek, the former CEO and former President of Heritage, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs, namely Doxycycline (as early as April 2013 until at least December 2015) and Glyburide (as early as April 2014 until at least December 2015).  Teva was the dominant market participant in the Glyburide market and a major player in the market for Doxycycline through its acquisition of Actavis during the Relevant Period.

725.    The DOJ further stated that the charges resulted from an ongoing federal antitrust investigation into price fixing, bid rigging and other anti-competitive conduct relating to generic drugs and marked "an important step" in ensuring true competition among companies "at a price set by the market, not by collusion."

726.    Two-count felony charges for violations of §1 of the Sherman Act against Glazer and Malek also were unsealed that day, alleging the following in sum and substance:

- Various corporations and individuals participated as co-conspirators in the offenses and performed acts and made statements in furtherance thereof;

- The defendants and co-conspirators knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic drugs, including Doxycycline and Glyburide, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of those drugs sold in the United States; and

- For the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators, among other things, participated in meetings and communications to discuss the sale of and to allocate customers or rig bids for the drugs; agreed not to compete against each other for certain customers; submitted bids, withheld bids, and issued proposals in accordance with their agreements; and sold the drugs at collusive and noncompetitive prices.

727.    In a felony case, an information outlining probable cause may be filed where the accused has waived indictment and has agreed, instead, to plead guilty.  Various news outlets, including *Bloomberg*, confirmed that Glazer and Malek were preparing to plead guilty and that their cooperation could lead to charges against executives at other drug companies.

728.    As a result of this new negative information, Teva's ADS price fell $0.66 per share, or 1.75%, from a close of $37.66 on December 13, 2016 to a close of $37.00 on December 14, 2016.  Teva's market capitalization was reduced by approximately $710 million.

## 6.    December 15-18, 2016

729.    During trading on the NYSE on December 15, 2016, Connecticut AG Jepsen announced that he and 19 other State AGs had filed a federal lawsuit for violation of §1 of the Sherman Act against Teva USA and five other drug companies (Heritage, Aurobindo, Citron, Mayne, and Mylan), alleging that they had entered into illegal conspiracies to unreasonably restrain trade, artificially inflate and manipulate prices, and reduce competition for Doxycycline Hyclate and Glyburide.

730.    The press release stated that portions of the complaint were redacted "to avoid compromising the ongoing investigation" as to "a number of additional generic drugs":

> In July 2014, the state of Connecticut initiated [a non-public] investigation of the reasons behind suspicious price increases of certain generic pharmaceuticals.  The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a well-coordinated and long- running conspiracy to fix

prices and allocate markets for doxycycline hyclate delayed release and glyburide. In today's lawsuit, the states allege that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives.

The complaint further alleges that the defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone and text message communications.  The anticompetitive conduct – including efforts to fix and maintain prices, allocate markets and otherwise thwart competition – caused significant, harmful and continuing effects in the country's healthcare system, the states allege.

The states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation.  The states allege that the companies' conduct violated the federal Sherman Act and are asking the court to enjoin the companies from engaging in illegal, anticompetitive behavior and for equitable relief, including substantial financial relief, to address the violations of law and restore competition.

731.    Connecticut led the multistate group of plaintiff states, which included Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington.

732.    As *Forbes* reported that day, the complaint revealed new information regarding Teva's potential exposure relating to two generic drugs, in that it "makes clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing" and that Glazer and Malek were cooperating; according to the publicly available complaint, Malek had a direct relationship with an unnamed Teva employee and the two agreed to raise the prices of Glyburide.

733.    As a result of this new negative information, the prices of Teva securities continued to decline.  Teva's ADS price fell $0.27 per share, or 0.73%, from a close of $37.00 on December 14, 2016 to a close of $36.73 on December 15, 2016.  Teva's market capitalization was reduced by approximately $274 million.

734.    The next trading day on the TASE, the ordinary share price fell ILS 140, or 0.98%, from a close of ILS 14,240 on December 15, 2016 to a close of ILS 14,100 on December 18, 2016.

### 7.    January 6-8, 2017

735.    Before the open of trading on the NYSE on January 6, 2017, Teva filed a press release on Form 6-K announcing a significant reduction in 2017 guidance, far below market expectations, due to previously unannounced poor performance and increased competitive pricing pressures in the market.  The press release quoted defendant Vigodman, who stated that "[t]he entire healthcare sector has faced significant headwinds, and we have not been immune." Defendants thus acknowledged for the first time that Teva had suffered greatly from competitive pressures such as pricing, a fact that they had denied vehemently until that point.  As explained by an analyst at Morningstar in a January 6, 2017 report, entitled "Teva Previews Weak Year on Competitive Pressures and Currency Headwinds," "Teva's management lowered its 2017 outlook from its previous forecast released in July [2016, at the time of the Notes Offering] as the firm succumbs to increased competitive pressure, especially in the U.S. generics market."

736.    Indeed, analysts at Piper Jaffray wrote that the disclosure "further erod[ed] what in [their] view was already limited management credibility."  The analysts rhetorically questioned "how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management in place?"

737.    That day, certain of the Officer Defendants hosted a "business outlook" conference call, during which defendant Vigodman stated that there was an EBITDA gap of $1.2 billion emanating from Teva's U.S. generics business.  He attributed the majority of that gap to delayed product launches.  Defendants continued to conceal, at least in part, the collusive practices in Teva's U.S. generics business, including bid rigging, price fixing, and market and customer allocation, as well as pricing pressure due to the weakening of the collusion.

738.    Investors and analysts reacted to the new negative news.  For instance, *TheStreet* reported that Teva's ADS prices "plummeted" due to the lowered 2017 guidance.

739.    As a result of this new negative information, the prices of Teva securities continued to decline.  That day, Teva's ADS price fell $2.86 per share, or 7.53%, from a close of $37.96 on January 5, 2017 to a close of $35.10 on January 6, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3 billion.

740.    The next trading day on the TASE, the ordinary share price fell ILS 790, or 5.49%, from a close of ILS 14,390 on January 5, 2017 to a close of ILS 13,600 on January 8, 2017.

### 8.    August 3-7, 2017

741.    Before the open of trading on the NYSE on Thursday, August 3, 2017, Teva filed a press release on Form 6-K announcing lower-than-expected second quarter 2017 results due to poor performance in its U.S. generics business and "accelerated price erosion and decreased volume due mainly to customer consolidation, greater competition as a result of an increase in generic drug approvals by the U.S. FDA, and some new product launches that were either delayed or subject to more competition."

742.    The Company also disclosed a net earnings loss primarily as a result of a $6.1 billion goodwill impairment charge related to its U.S. generics unit – which consisted of both Teva legacy and Actavis generics business.

743.    This disclosure revealed that Teva's business was facing significant and permanent pricing pressure.  As *Bloomberg* reported that day, "Pharma Giant Teva's Stock Is Imploding As Generic Drugs Get Cheaper."  Deutsche Bank analysts reported in an August 3, 2017 report that "TEVA described increased pressures on its US generic business, which it believes could persist in 2018 and potentially."  Defendants until then had vehemently denied that Teva was susceptible to such pricing pressure.

744.    As a result of this new negative information, Teva's ADS price fell $7.50 per share, or 24%, from a close of $31.25 on August 2, 2017 to a close of $23.75 on August 3, 2017, on high

trading volume.  The ordinary share price also declined ILS 1,980, or 17.79%, from a close of ILS 11,130 on August 2, 2017 to a close of ILS 9,150 on August 3, 2017.  Teva's market capitalization was reduced by approximately $8 billion.

745.    On Friday, August 4, 2017, Fitch Ratings also downgraded Teva to BBB- (one step above junk), with a negative outlook.  As a result of the news on August 3 and 4, Teva's ADS price continued to fall by an additional $3.15 per share, or 13.26%, from a close of $23.75 on August 3, 2017 to a close of $20.60 on August 4, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3.3 billion.

746.    The next trading day on the TASE, the ordinary share price continued to fall by ILS 2,022, or 22.10%, from a close of ILS 9,150 on Thursday, August 3, 2017 to a close of ILS 7,128 on Sunday, August 6, 2017.

747.    The next trading day, Monday, August 7, 2017, as the prices of Teva securities continued to drop, Morgan Stanley analysts downgraded Teva's ADSs to "Underweight," noting specifically that they had "underappreciated the risk of generics pricing pressure to Teva's earnings and dividend, and we expect Teva to continue to underperform given overhangs."  In other words, the analysts had been led to believe through Defendants' repeated and adamant denials that Teva was not vulnerable to the pricing pressure.

748.    As a result of the news on August 3 and 4, 2017, Teva's ADS price continued to fall by an additional $2.01 per share, or 9.76%, from a close of $20.60 on August 4, 2017 to a close of $18.59 on August 7, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $2.2 billion.

749.    The ordinary share price also continued to fall by ILS 18, or 0.25%, from a close of ILS 7,128 on Sunday, August 6, 2017 to a close of ILS 7,110 on Monday, August 7, 2017.

750. In total, over these three trading days, Teva's ADS price fell $12.66 per share, or 40.6%, and the ordinary share price fell ILS 4,020, or 36.2%.  Teva's market capitalization was reduced by approximately $13 billion.

### 9. November 2, 2017

751. On November 2, 2017, Teva filed its 3Q2017 Form 6-K, reporting the Company's third quarter 2017 financial results, including a 9% decline in U.S. Generic Medicine quarterly revenues compared to the third quarter of 2016.  The decrease was misleadingly attributed to "pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

752. Investors and analysts reacted negatively to this news.  Analysts at Cowen and Company called the Company's full year guidance "unfavorable" and stated that, with a "difficult generic pricing environment and competitive pressures – which are not being properly offset by new product launches – the Teva business model is now upside down."  Analysts at RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising."  Wells Fargo Securities analysts found Teva's results to be "especially disappointing."

753. As a result of this new negative information, the prices for Teva securities declined. The ADS price fell $2.79 per share, or nearly 20%, from a close of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017, on high trading volume.  Teva's market capitalization was reduced by approximately $3 billion.

754.    The next trading day on the TASE, Teva's ordinary shares fell ILS 670, or 13.65%, from a close of ILS 4,908 on Wednesday, November 1, 2017 to a close of ILS 4,238 on Thursday, November 2, 2017.

### 10.    February 8, 2018

755.    On February 8, 2018, Teva issued a press release announcing its fourth quarter and full year financial results, including a staggering $17.1 billion goodwill impairment mainly related to its generics business for 2017.  On the conference call with investors held later that day, Teva explained that $11 billion of the impairment "related to our U.S. generics business as well as additional impairments of other long-lived assets of $3.2 billion, mainly related to a revaluation of generic products acquired from Actavis."

756.    Investors and analysts reacted negatively to this news.  Analysts at Wells Fargo Securities stated that the Company missed consensus expectations "by a significant margin," but noted that:

> [W]e believe it will be the lower than consensus 2018 outlook that investors will be focused on, especially the commentary about generic pricing worsening in 4Q and the overall environment worsening for the value of future launches.  Teva took a $17.1 billion goodwill impairment, which investors should see as reflective of how challenging the situation is.

BTIG analysts noted "another major write-down following last year's $6B goodwill impairment." Similarly, IBI Brokerage stated that the $11 billion "impairment charge [was] almost entirely for the generics business in the US" and that guidance for fiscal year 2018 was "way below market expectations."

757.    As a result of this new negative information, the prices for Teva securities declined. Teva's ADS price fell $2.21 per share, or over 10.5%, from a close of $20.85 on February 7, 2018 to a close of $18.64 on February 8, 2018, on high trading volume.  Teva's market capitalization was reduced by approximately $2.3 billion.

758.    The next trading day on the TASE, the ordinary share price fell ILS 500, or 6.9%, from a close of ILS 7,200 on February 7, 2018 to a close of ILS 6,700 on February 8, 2018.

**N.      Presumption of Reliance and Fraud-on-the-Market Doctrine**

759.    There is a presumption of reliance established pursuant to the fraud-on-the-market doctrine because, among other things:

(a)      Defendants made misrepresentations or omissions that were public;

(b)      the misrepresentations or omissions were material;

(c)      the misrepresentations or omissions would tend to induce a reasonable investor to misjudge the value of Teva securities;

(d)      Teva securities traded in an efficient market; and

(e)      Plaintiffs traded in Teva securities between the time the misrepresentations or omissions were made and the time when the truth was revealed.

760.    At all relevant times, the market for Teva securities was efficient for the following reasons, among others:

(a)      Teva's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      the average weekly trading volume of Teva securities was significant;

(c)      as a regulated issuer, Teva filed public reports with the SEC and the NYSE;

(d)      Teva was eligible to file simplified SEC filings;

(e)      Teva regularly communicated with the public through established market communication channels, including through regular dissemination of news releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public market.

761.    As a result of the foregoing, the market for Teva securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in their prices.  All purchasers of Teva securities during the Relevant Period suffered similar injury through their purchases of Teva securities at artificially inflated prices, and a presumption of reliance therefore applies.

762.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

### O.    Inapplicability of the Statutory Safe Harbor or Bespeaks Caution Doctrine

763.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.   First, the statements complained of herein concerned present or historical facts or conditions that were existing or purported to exist at the time they were made. Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with GAAP.  Further, to the extent that any of the untrue or misleading statements alleged herein were identified as forward looking, and can be construed as forward looking, the statements were not accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those statements, and the generalized disclosures made by Defendants were not sufficient to shield them from liability.

764.    In the alternative, to the extent the statutory safe harbor otherwise would apply, Defendants are liable for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was false or misleading and/or each such statement was made or approved by an executive officer of the Company who knew that the statement was false or misleading.

## IV.    INFLATED PROFIT METHODOLOGY

765.    Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public.  Counsel therefore undertook an investigation and engaged econometric experts, working at counsel's direction, to calculate and isolate the profit that Teva earned from its Price-Hike Strategy.  The investigation comprised multiple distinct econometric analyses, including regression analyses, that ultimately took into account thousands of data points.

766.    The analysis screened Teva's entire generic drug portfolio during the Relevant Period to identify significant WAC increases.  The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually.  Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

767.    To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase.  To do so, the drug's specific pricing history was analyzed using a regression analysis to determine the price through the Relevant Period had prevailing drug-specific pricing trends continued.  The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

768.    Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for: (i) Teva's sales quantities; and

(ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

769.    Sales volumes were derived by reference to figures reported in a subscription database.  Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

770.    Teva's discounts and rebates are unavailable by any means of which counsel is aware.  Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the Relevant Period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data.  This analysis was unique for each drug and captured fluctuations over time.

## V.    CLAIMS FOR RELIEF

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Teva and the Officer Defendants for ADS Purchases

771.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

772.    This Count is asserted against Teva and the Officer Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

773.    The defendants named in the Count disseminated or approved the false and misleading statements specified above during the Relevant Period, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

774.    Teva and the Officer Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Teva ADSs during the Relevant Period.

775.    Teva and the Officer Defendants, individually and in concert, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, and by the use of the facilities of a national securities exchange with respect to Teva's ADSs, engaged in a continuous course of conduct that operated as a fraud and deceit, or otherwise used or employed manipulative or deceptive devices or contrivances, which were intended to and did: (i) deceive the investing public, including Plaintiffs, regarding, among other things, Teva's participation in illegal anti-competitive activities; (ii) artificially inflate and/or maintain the market price of Teva ADSs; and (iii) cause Plaintiffs to purchase Teva ADSs at artificially inflated prices, and thereby suffer losses when the truth was revealed.

776.    Teva and the Officer Defendants are liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

777.    As set forth above, Teva and the Officer Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Teva ADSs, were either known to these defendants or were so obvious that these defendants should have been aware of them.

778.    Plaintiffs suffered damages as a result of Teva's and the Officer Defendants' wrongful conduct in that, they purchased or otherwise acquired Teva ADSs at artificially inflated

prices in reliance on (i) these defendants' untrue or misleading statements or omissions of material fact and/or (ii) the integrity of the market. Plaintiffs would not have purchased or otherwise acquired Teva ADSs at the prices they paid, or at all, had they been aware that those prices were artificially inflated and/or maintained as a result of the wrongful conduct alleged herein.

779.    As a direct and proximate result of Teva's and the Officer Defendants' wrongful conduct, Plaintiffs suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Teva ADSs during the Relevant Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Officer Defendants for ADS Purchases

780.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

781.    This Count is asserted against the Officer Defendants pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

782.    During their tenures as officers and/or directors of Teva, the Officer Defendants were controlling persons of the Company, within the meaning of §20(a) of the Exchange Act, and were culpable participants in the alleged wrongful conduct that is the basis of Count I.

783.    The Officer Defendants, by virtue of their control and authority as officers and/or directors of Teva and their direct participation in and/or awareness of the Company's operations and finances, possessed the power and authority to, and did, direct or cause the direction of the management and policies of the Company and its employees, or otherwise cause the Company to engage in the alleged wrongful conduct that is the basis of Count I.

784.    The Officer Defendants were able to and did control, directly and indirectly, the content of the public statements made by Teva during the Relevant Period, including its materially

misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

785.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Officer Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   The Officer Defendants regularly spoke on behalf of the Company and had the power to, and did, control, directly or indirectly, the decision-making of the Company.  The Officer Defendants signed the Company's SEC filings during the Relevant Period, and/or were directly involved and responsible in providing false and misleading information and certifying and approving the false and misleading statements disseminated by Teva during the Relevant Period.  The Officer Defendants were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false and misleading information and certifying and approving the false statements disseminated by Teva during the Relevant Period.  As a result of the foregoing, the Officer Defendants, as a group and individually, were controlling persons of Teva within the meaning of §20(a) of the Exchange Act.

786.    As set forth above, Teva violated §10(b) of the Exchange Act and Rule 10b- 5; as controlling persons of the Company, each of the Officer Defendants is liable jointly and severally for such violation, with and to the same extent as the Company.  Moreover, as detailed above, during the respective times the Officer Defendants served as officers and/or directors of Teva, each of these Officer Defendants was culpable for the material misstatements and omissions made by Teva.  As a direct and proximate result of these Officer Defendants' conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of Teva ADSs.

## COUNT III

### For Violation of §§1-402(c) and 1-501(c) of the PSA
### Against All Defendants for All Teva Securities Purchases

787.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

788.     This Count is asserted against Defendants (Teva, Teva USA, and the Officer Defendants) for violations of §§1-402(c) and 1-501(c) of the PSA, 70 Pa. Stat. §§1-402(c) & 1-501(c).

789.     Defendants directly and/or indirectly, for the purpose of inducing the purchase of Teva securities by others, participated in the circulation and/or dissemination of misrepresentations and omissions of material facts to the effect that the price of the security would or was likely to rise.  During the Relevant Period, Defendants sold or offered to sell Teva securities, or received consideration, directly or indirectly, from a person who sold or offered to sell Teva securities.

790.     Pennsylvania is "the factual center" of this action.  *See Galmi*, ECF No. 37-1, at 6. The false statements "were prepared in Pennsylvania and Israel."  *Id.*; *see also* Kim Declaration, ¶5 ("Individuals, myself included, who participated in drafting and preparing [the relevant SEC] filings, or who otherwise controlled the drafting process, are located in or around Petach Tikva, Israel and North Wales, Pennsylvania.").  And "[s]everal departments, including investor relations and sales and marketing for the North American generic medicines business, are based at the Pennsylvania offices.  In addition, all sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania."  *Id.*, ¶4.  Documents related to this case – "*e.g.*, materials related to Teva USA, drug pricing and U.S. Competitors . . . are located in Pennsylvania, or, if not there, [in] Israel." *Id.*, ¶3.  Furthermore, Teva's Vice President and Deputy General Counsel, Corporate/M&A, Kim, "also live[s] and work[s] in Pennsylvania," and Teva

USA's headquarters and principal executive offices are located at 1090 Horsham Road, North Wales, Pennsylvania, 19454." *Id.*, ¶¶1, 3-4.

791. Defendants willfully participated in the acts and transactions that caused the circulation and/or dissemination of misrepresentations and omissions of material facts.

792. Defendants are liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

793. Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein were either known to Defendants or were so obvious that Defendants should have been aware of them.

794. Plaintiffs suffered damages as a result of Defendants' wrongful conduct in that they purchased or otherwise acquired Teva securities at artificially inflated prices in reliance on Defendants' untrue or misleading statements or omissions of material fact and/or the integrity of the market.

795. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages.

### COUNT IV

**For Violation of the Israel Securities Law, 1968,
Against All Defendants for Ordinary Share Purchases Made on the TASE**

796. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

797. Throughout the Relevant Period, Teva's ADSs and ordinary shares were "dual listed" on both the NYSE and the TASE under Israeli law.[15]

---

[15] *See* http://www.tase.co.il/eng/marketdata/stocks/marketdata/pages/marketdata.aspx (last visited Aug. 2, 2018).

798.    Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets. For dual-listed firms incorporated in Israel, Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing. *See* Israel Securities Law, 1968 ("Securities Law"), §§1, 35T, 35DD, 35EEE.

799.    Section 1 of the Securities Law defines a "foreign corporation" as "a corporation incorporated in Israel whose securities are listed for trade on a foreign stock exchange."  The NYSE is a "foreign stock exchange" under the Securities Law.  Because Teva is incorporated in Israel and has its securities, such as the ADSs, listed for trading on the NYSE, it is a "foreign corporation" under the Securities Law.  Therefore, the TASE correctly recognizes Teva as a dual-listed company.

800.    For "foreign corporations" that are dual listed in the United States, Israeli law applies the reporting requirements (including the anti-fraud requirements) of the United States. *See* Securities Law §§35T, 35EE.

801.    Section 1 of the Securities Law defines "the foreign law" as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."  A "foreign corporation" must agree to comply with the foreign law as a matter of Israeli law.  *See* Securities Law §35T(a)(1).  Indeed, a foreign corporation, like Teva, generally only needs to file its U.S. SEC filings in Israel (without further alteration or translation) in order to comply with Israeli reporting requirements.  As a matter of Israeli securities law, Teva agreed to comply with the U.S. securities laws and the rules of the NYSE to fulfill its obligations under Israeli law.

802.    Accordingly, to construe the propriety of Teva's disclosures to investors, Israel applies U.S. laws and regulations, including the anti-fraud provisions of the U.S. securities laws,

to enforce disclosure obligations for dual-listed stocks.  *See* Securities Law, §§35T, 35DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011 (subsequent to and in light of *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)); Letter from Israel Securities Authority to the SEC (Feb. 18, 2011), https://www.sec.gov/comments/4-617/4617-45.pdf (last visited Aug. 2, 2018).

803.    In a Motion to Dismiss the Class Action Complaint filed on December 1, 2017, in *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-00558-SRU (D. Conn.), defendants Teva, Vigodman, Desheh, Altman, Oberman, Olafsson, Peterburg, and Bhattacharjee

> agree[d] that Israeli law mirrors U.S. law here.  The Israeli dual-listing regime was purposefully created in 2000 to make the Tel Aviv Stock Exchange more attractive to Israeli companies (like Teva) who otherwise might list their securities only on exchanges outside of Israel.  *See generally, e.g.*, Marcus Best & Jean-Luc Soulier, Israel §21.1, *International Securities Law Handbook* (4th ed. 2014).  Because issuers find it unattractive to be subject to multiple and diverging regulatory regimes, Israel simply adopts the securities law requirements of the foreign jurisdiction – in this case, the United States – instead of enforcing "requirements that apply to Israeli companies listed solely on the TASE."  *Id.*  As Plaintiffs acknowledge, both Israeli case law and the Israel Securities Authority's public statements support the view that, as a matter of Israeli law, Israel voluntarily applies U.S. liability standards to dual-listed companies like Teva.  Compl., ¶1084; *see In re VeriFone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140 EMC, 2014 WL 12646027, at *1 (N.D. Cal. Feb. 18, 2014) (noting, in case involving securities fraud claims under Israeli law and a dual-listed company, that "the Israeli district court ruled twice that U.S. law, and not Israeli law, applies").

804.    This Count incorporates Counts I and II under the Exchange Act by reference

## VI.    SECURITIES ACT ALLEGATIONS

### A.    Securities Act Parties

#### 1.    Securities Act Plaintiffs

805.    Plaintiffs purchased or otherwise acquired Teva ADSs in or pursuant to and/or traceable to the ADS Offering.  For instance, on and/or around the December 3, 2015 offering date

and at the $62.50 offering price, Plaintiffs purchased Teva ADS (SEDOL: 2883878), which are listed on the NYSE, in the ADS Offering.

806.    As a result of material misstatements and omissions made by the Securities Act Defendants (defined below), Plaintiffs purchased or otherwise acquired Teva ADSs at artificially inflated prices.  When the relevant truth concerning the Securities Act Defendants' misstatements and omissions of material fact leaked out into the market from August 2016 to February 2018, the price of Teva ADSs fell, causing Plaintiffs to suffer losses.

### 2.    The Teva Securities Act Defendants

807.    Each of the following defendants is statutorily liable under §§11, 12(a)(2) and/or 15 of the Securities Act for the material misstatements and omissions contained in and incorporated (and thereby made anew) in the ADS Offering Materials (as defined below).

808.    Teva was the issuer of the ADSs.

809.    Defendant Vigodman signed the ADS/Preferred Registration Statement and the Master Purchase Agreement.  He also signed and certified the 2014 Form 20-F.  He also was, at all relevant times, a member of Teva's Board at the time of the ADS Offering.

810.    Defendant Desheh signed the ADS/Preferred Registration Statement and the ADS Underwriting Agreement, signed and certified Teva's 2014 Form 20-F, and signed Teva's 1Q2015 Form 6-K, 2Q2015 Form 6-K, 3Q2015 Form 6-K, and the July 28, 2015 Form 6-K with the Master Purchase Agreement filed with the SEC and incorporated by reference into the ADS Offering Materials.

811.    Defendant Griffin signed the ADS Preferred Registration Statement and was at all relevant times Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and the Authorized U.S. Representative of Teva.

812.   Defendant Peterburg signed the ADS Preferred Registration Statement and was at all relevant times Chairman of Teva's Board.

813.   Defendants Teva, Vigodman, Desheh, Peterburg, and Griffin are collectively referred to herein as the "Teva Securities Act Defendants."

### B.   The Relevant Offering

814.   On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion.  These offerings consisted of approximately $3.375 billion worth of Teva's ADSs and approximately $3.375 billion worth of its Preferred Shares, and were announced pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 filed with the SEC on November 30, 2015 (the "ADS/Preferred Registration Statement").    Each ADS represents one ordinary share of Teva.  Likewise, on November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering dated November 30, 2015.

815.   On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings.  That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the ADS Prospectus Supplement, and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

816.   The ADS/Preferred Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred Registration Statement, including the ADS Prospectus Supplement, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS Offering Materials."

817.    On December 8, 2015, Teva closed the ADS Offering and issued 54 million ADSs at $62.50 per ADS.   The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses by Teva, were approximately $3.29 billion.

818.    Certain underwriters of the ADS Offerings exercised their options to purchase additional ADSs to cover overallotments.   Teva issued an additional 5.4 million ADSs at the time of such purchases, on January 6, 2016.   As a result, Teva received an additional $329 million in net proceeds for the ADS Offering, for an aggregate of approximately $3.62 billion for the ADS Offering.

### C.    Teva Filings Incorporated into the Offering Materials

819.    The ADS/Preferred Registration Statement and the ADS Prospectus Supplement incorporated by reference various documents that Teva had previously filed with the SEC and all §§13(a), 13(c), 14 or 15(d) reports or documents filed by Teva subsequent to the dates of the ADS/Preferred Registration Statement and the ADS Prospectus Supplement, until the ADS Offering was complete.   Specifically, the ADS/Preferred Registration Statement and the ADS Prospectus Supplement incorporated by reference Teva's 2014 Form 20-F, 1Q2015 Form 6-K, 2Q2015 Form 6-K, 3Q2015 Form 6-K, the July 28, 2015 Form 6-K with the Master Purchase Agreement and the ADS Underwriting Agreement.   The incorporated 2014 Form 20-F, 1Q2015 Form 6-K, 2Q2015 Form 6-K, and 3Q2015 Form 6-K contained material misstatements and omissions concerning: (i) the collusive activities and the Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) material trends that were not disclosed under Item 5 of the 2014 Form 20-F; and (iii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market, as well as other topics discussed below.   The statements and omissions in the 2014 Form 20-F, 1Q2016 Form 6-K, 2Q2015 Form 6-K and 3Q2015 Form 6-K and the reasons why they are materially misleading are set forth in §III.J.   The July 28, 2015 Form 6-K

with the Master Purchase Agreement and the ADS Underwriting Agreement contained material misstatements and omissions concerning Teva's compliance to laws and regulations and the reasons why they are materially misleading are set forth in §III.J.

### D.     The Ads Offering Materials Contained Material Misstatements and Omissions

#### 1.     Material Misstatements and Omissions Concerning Collusive Activities and the Price-Hike Strategy and the Benefits and Risks Stemming Therefrom

820.     The ADS Offering Materials contained material misstatements and omissions concerning the attribution of the sources of Teva's generics segment's revenues and profit during the Relevant Period.  The statements and omissions contained in the 2014 Form 20-F, the 1Q2015 Form 6-K, 2Q2015 Form 6-K and 3Q2015 Form 6-K and the reasons why they are materially misleading are described in §III.J.

821.     In sum, the various financial disclosures regarding the sources of Teva's generics revenues and profits contained within the incorporated filings were materially misstated because they failed to disclose collusive activities and the Price-Hike Strategy, pursuant to which Teva implemented price hikes on a number of Teva's generic drugs, generating a significant amount of the Inflated Profit, including the Collusive Profit, as a result of those price hikes that was unsustainable, while attributing the source of those profits to other sources and failing to disclose that they were caused by concealed price hikes.

822.     Teva failed to disclose the material risks associated with collusive activities and the Price-Hike Strategy.  Those material risks included: (i) increased public, legislative, and regulatory scrutiny of generic drug price increases that undermined Teva's ability to sustain the Inflated Profit and Collusive Profit from price increases and/or implement further price increases; (ii) increased legislative and law enforcement scrutiny that resulted in legal actions being taken against Teva; (iii) increased competition from other generic manufacturers who undercut Teva's raised prices as

they themselves faced increased scrutiny; and (iv) significant disruption caused by the termination of members of senior management who were responsible for the strategy, and the attendant resources required to locate and hire suitably qualified replacements.

### 2. Material Misstatements and Omissions Concerning Known Trends Required to Be Disclosed Pursuant to Item 5 of Form 20-F

823.    Incorporating Teva's 2014 Form 20-F, the ADS Offering Materials contained material misstatements and omissions in that they violated SEC Item 5 of Form F-20 by failing to disclose two known trends.  *See* §III.C.1, *supra*.  The Securities Act Defendants failed to disclose the trend that Teva's financial success was materially dependent on collusive activities and the Price-Hike Strategy and the attendant price increases on generic drugs that generated significant amounts of Collusive Profit and Inflated Profit.  These prices increases generated as much as $[2.3] billion in profit for Teva over the Relevant Period.  Yet the existence of this trend and the related risks and uncertainties surrounding its source and sustainability were concealed.

### 3. Material Misstatements and Omissions Concerning Competition in the U.S. Generics Market

824.    Incorporating Teva's 2014 Form 20-F, the ADS Offering Materials contained material misstatements and omissions in that they, among other things, purportedly: (i) warned investors that one of the primary risks that Teva faced was "intense" competition in the U.S. generics drug market, and that this competition would force the price of generic drugs down; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics.  These statements and omissions were materially misstated for all of the reasons described above in §III.J.1.

### 4. Material Misstatements and Omissions Concerning Legal Compliance

825.    The ADS Offering Materials contained material misstatements and omissions of material fact in that Teva and its subsidiary Teva USA were not in compliance with laws and

regulations.  Teva's undisclosed inflation of sales through collusive price-fixing and market allocation were violations of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant financial and reputational harm as set forth in §III.J.6.

## VII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT V

**For Violation of §11 of the Securities Act in Connection with the ADS Offering Against Defendants Teva, Vigodman, Desheh, Peterburg and Griffin**

826.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

827.    Defendants' liability under this Count is predicated on the participation of each of the Securities Act Defendants in the ADS Offering pursuant to the ADS Offering Materials, which contained untrue statements and omissions of material fact.

828.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in connection with the ADS Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of ADS Offering.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

829.    This Count is brought pursuant to §11 of the Securities Act against defendants Teva, Vigodman, Desheh, Peterburg, and Griffin and arises out of Plaintiffs' purchase or acquisition of Teva ADSs pursuant and/or traceable to the ADS Offering.  This Count is based solely in strict liability and negligence.  Teva was the issuer, within the meaning of §11 of the Securities Act, pursuant to the ADS Offering Materials.

830.    The ADS Offering Materials, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

831.    The defendants named in this Count issued or disseminated, caused to be issued or disseminated, or participated in the issuance or dissemination of the ADS Offering Materials.

832.    As the issuer of the ADS Offering, Teva is strictly liable for the actionable statements and omissions in the ADS Offering Materials.

833.    The other defendants named in this Count acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in the ADS/Preferred Registration Statement were true and there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading.  These defendants are liable for the actionable statements and omissions in the ADS/Preferred Registration Statements in that, among other things:

- Vigodman, Desheh, Peterburg, and Griffin each signed the ADS/Preferred Registration Statement as a senior officer and/or director of Teva; and

- Vigodman and Peterburg were directors of the Company at the time of the filing of the relevant parts of the ADS/Preferred Registration Statement with respect to which their liability is asserted.

834.    When they acquired the securities in, pursuant, and/or traceable to the ADS Offering, Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS Offering Materials.

835.    Plaintiffs suffered damages in connection with the purchase or acquisition of the ADSs in, pursuant to, and/or traceable to the ADS Offering.

## COUNT VI

### For Violation of §12(a)(2) of the Securities Act in Connection with the ADS Offering Against Defendants Teva, Vigodman, Desheh, Peterburg and Griffin

836.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

837.    For the purposes of this Count, Plaintiffs assert only negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the ADS Offering are alleged to have been materially misstated statements of opinion or belief when made and at the time of ADS Offering.

838.    This claim is brought pursuant to §12(a)(2) of the Securities Act against Teva, Vigodman, Desheh, Peterburg, and Griffin on behalf of Plaintiffs who purchased ADSs in, pursuant to, and/or traceable to the ADS Offering.

839.    The defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) the ADSs, within the meaning of the Securities Act, by means of a prospectus or oral communication.

840.    The defendants named in this Count assisted in the planning of the ADS Offering and actively participated in decisions regarding, among other things, the price of the ADSs and the information contained in the ADS Prospectus Supplement.

841.    The ADS Prospectus Supplement included (and/or incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

842.    The defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the ADS Prospectus Supplement did not include untrue or misleading statements or omissions of material fact.

843.    When they acquired the ADSs directly in, pursuant to, and/or traceable to the ADS Offering, Plaintiffs did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the ADS Prospectus Supplement.

844.    Plaintiffs suffered damages in connection with their purchases or acquisitions of the ADSs in, pursuant to, and/or traceable to the ADS Offering.

845.    By reason of the foregoing, the defendants named in this Count are liable to Plaintiffs for either: (i) the consideration paid for the ADSs with interest thereon, less the amount of any income received thereon, upon tender of such ADSs; or (ii) damages as to the securities no longer owned.

## COUNT VII

### For Violation of §15 of the Securities Act in Connection with the ADS Offering Against Defendants Vigodman, Desheh, Peterburg and Griffin

846.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.  This Count is based solely on negligence.

847.    This Count is brought pursuant to §15 of the Securities Act against defendants Vigodman, Desheh, Peterburg, and Griffin in connection with the ADS Offering on behalf of Plaintiffs who purchased or otherwise acquired the ADSs pursuant and/or traceable to the ADS Offering Materials and were damaged thereby.  For purposes of this Count, Plaintiffs assert only negligence claims and expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the ADS Offering are

alleged to have been materially misstated statements of opinion or belief when made and at the time of the ADS Offering.

848.    During their tenures as officers and/or directors of the Company, Vigodman, Desheh, Peterburg, and Griffin were controlling persons of Teva, within the meaning of the Securities Act.

849.    The defendants named in this Count, by virtue of their positions of control and authority and their direct participation in and/or awareness of Teva's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Teva and its employees, or cause Teva to issue, offer, and/or sell ADSs pursuant to the defective ADS Offering Materials.

850.    The defendants named in this Count had the power to, and did, control the decision-making of Teva, including the content and issuance of the statements contained (and/or incorporated by reference) in the ADS Offering Materials.  They were provided with or had unlimited access to copies of the ADS Offering Materials (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected.  These defendants signed the ADS/Preferred Registration Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing the false or misleading information contained in the ADS Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

851.    The defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the ADS Offering

Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

852.    Plaintiffs suffered damages in connection with the purchase or acquisition of the ADSs in, pursuant to, and/or traceable to the ADS Offering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

A.    Declaring and determining that Defendants violated the Exchange Act, Securities Act, PSA and Israel Securities Law, 1968 by reason of the acts and omissions alleged herein;

B.    Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

C.    Awarding Plaintiffs reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  August 3, 2018                    SEEGER WEISS LLP
                                          TERRIANNE BENEDETTO

                                          TERRIANNE BENEDETTO
                                          1515 Market Street, Suite 1380
                                          Philadelphia, PA  19102
                                          Telephone:  215/564-2300
                                          215/851-8029 (fax)
                                          tbenedetto@seegerweiss.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
77 Water Street, 8th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
SARA B. POLYCHRON
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
lukeb@rgrdlaw.com
ryanl@rgrdlaw.com
eniehaus@rgrdlaw.com
alau@rgrdlaw.com
spolychron@rgrdlaw.com
jstein@rgrdlaw.com

Attorneys for Plaintiffs

# APPENDIX A
## Teva WAC Increases

Parallel Price Increases Indicated in **Orange**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **April 4, 2014** | |
| Ketoconazole Tablets | 250% |
| Bumetanide Tablets | 249% |
| Cephalexin Oral Suspension | 111% |
| Nystatin Tablets | 110% |
| Ketoconazole Cream | 108% |
| Hydroxyzine Pamoate Capsules | 94% |
| Cyproheptadine HCL Tablets | 93% |
| Dicloxacillin Tablets (1st of 2) | 91% |
| Theophylline Anhydrous SR Tabs | 75% |
| Anagrelide HCL Capsules (1st of 2) | 58% |
| Estazolam Tablets (1st of 2) | 37% |
| **April 15, 2014** | |
| Baclofen Tablets | 381% |
| **July 1, 2014** | |
| Fluocinonide .05% Cream | 435% |
| Fluocinonide .05% Ointment | 415% |
| Fluocinonide .05% Gel | 255% |
| **August 28, 2014** | |
| Carbamazepine Tablets | 1543% |
| Carbamazepine Chewable Tablets | 270% |
| Enalapril Maleate Tablets (2nd of 2) | 230% |
| Clotrimazole Topical Solution (1st of 2) | 164% |
| Flutamide Capsules | 140% |
| Meperidine HCL Tablets | 110% |
| Penicillin V Potass. Tablets | 100% |
| Nefazodone Tablets (1 of 2) | 90% |
| Mexiletine Capsules | 90% |
| Cromolyn Sodium Inhalant (1st of 2) | 90% |
| Desmopressin Acetate Tablets | 75% |
| Fosinopril Tablets | 70% |
| Megestrol Acetate Tablets | 55% |
| Diclofenac Potass. Tablets (2nd of 2) | 50% |
| Cimetidine Tablets (2nd of 3) | 29% |
| Tolmetin Sodium Capsules (2nd of 3) | 25% |
| Loperamide HCL Capsules (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **July 3, 2013** | |
| Oxybutynin Chloride Tablets | 812% |
| Nadolol Tablets | 786% |
| Fluconazole Tablets | 218% |
| Methotrexate Sodium Tablets | 163% |
| Cimetidine Tablets (1st of 3) | 151% |
| Prazosin Capsules | 118% |
| Ranitidine HCL Tablets | 115% |
| **July 19, 2013** | |
| Enalapril Maleate Tablets (1st of 2) | 316% |
| **August 9, 2013** | |
| Doxazosin Mesylate Tablets | 305% |
| Etodolac Tablets | 282% |
| Pravastatin Sodium Tablets | 175% |
| Ketoprofen Capsules (1st of 3) | 168% |
| Etodolac SR Tablets | 96% |
| Tolmetin Sodium Capsules (1st of 3) | 91% |
| Clemastine Fumarate | 90% |
| Diltiazem HCL Tablets | 71% |
| Ketorolac Trometh. Tablets (1st of 2) | 34% |
| Diclofenac Potass. Tablets (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **January 28, 2015** | |
| Fluoxetine HCL Tablets | 608% |
| Propranolol Tablets | 447% |
| Glimepiride Tablets | 312% |
| Ciprofloxacin HCL Tablets | 194% |
| Penicillin v Potass. Oral Sol. (1st of 2) | 91% |
| Nortryptiline HCL Capsules | 91% |
| Estradiol Tablets | 90% |
| Ketoprofen Capsules (2nd of 3) | 90% |
| Danazol Capsules | 90% |
| Ketorolac Trometh. Tablets (2nd of 2) | 90% |
| Methyldopa Tablets | 90% |
| Diltiazem HCL Tablets | 90% |
| Carbidopa/ Levodopa Tablets | 50% |
| Griseofulvin Oral Suspension | 50% |
| **July 29, 2015** | |
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **April 6, 2016** | |
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

**APPENDIX B**
**Trade Shows and Conferences**

## Trade Shows and Conferences

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| GPhA 2012 Technical Conference<br>October 1-3, 2012<br>Bethesda North Marriott Hotel &<br>   Conference Center, Bethesda, MD | ○ **Teva**<br>○ Actavis<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | **Teva**<br>   ○ Debbie Jaskot, Vice President, US Generic<br>      Regulatory Affairs & North American<br>      Policy<br>   ○ Jonathan Kafer, VP Sales & Marketing<br>   ○ UDL (Mylan Institutional)<br>Actavis<br>   ○ Joyce DelGaudio, Executive Director,<br>      Regulatory Affairs<br>Apotex<br>   ○ Bruce Clark, Senior Vice President,<br>      Scientific & Regulatory Affairs<br>Dr. Reddy's<br>   ○ Nick Cappuccino, Vice-President & Head<br>      of Global Quality<br>Impax<br>   ○ Marcy Macdonald, Vice President<br>      Regulatory Affairs<br>Mylan<br>   ○ Marcie McClintic, Vice President &<br>      General Counsel<br>Perrigo<br>   ○ Richard Stec, Vice President, Global<br>      Regulatory Affairs |
| GPhA 2013 Annual Meeting<br>February 20-22, 2013<br>JW Marriott Orlando Grande Lakes,<br>   Orlando, FL | ○ **Teva**<br>○ Actavis<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Wockhardt<br>○ Zydus | **Teva**<br>   ○ Allan Oberman, President & CEO<br>Actavis<br>   ○ Sigurdur Olafsson, President<br>Mylan<br>   ○ Tony Mauro, President<br>Sandoz<br>   ○ Donald DeGolyer, President |
| 2013 NACDS Annual Meeting<br>April 20-23, 2013<br>Palm Beach, FL | ○ Actavis<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | **Teva**<br>Jeremy Levin, President and CEO<br>   ○ Allan Oberman, President and CEO of<br>      **Teva** Americas Generics<br>   ○ Maureen Cavanaugh, Sr. VP and Chief<br>      Operating Officer of North America<br>      Generics<br>   ○ Teri Coward, Sr. Director Sales and Trade<br>      Relations |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Michael Sine, Director, Corporate Account Group<br>○ Jonathan Kafer, Executive VP, Sales and Marketing<br>○ David Marshall, VP of Operations<br>○ Dave Rekenthaler, VP of Sales<br>Actavis<br>○ Paul Bisaro, Board Member<br>○ Andrew Boyer, President and CEO of North America Generics<br>○ Michael Reed, Executive Director of Trade Relations<br>○ Michael Baker, Executive VP of Trade Sales and Development<br>○ Paul Reed, Sr. Director of Trade Sales and Development<br>○ and Robert Stewart, Chief Operating Officer<br>Mylan<br>○ Joe Duda, President<br>○ Tony Mauro, Chief Commercial Officer<br>○ Robert Potter, Sr. VP of North America National Accounts and Channel Development<br>○ Jeffrey May, VP of North America Product Strategy<br>○ Jim Nesta, VP of Sales<br>Par<br>○ Paul Campanelli, President<br>○ Jon Holden, VP of Sales<br>○ Michael Altamuro, VP of Marketing and Business Analytics<br>○ Renee Kenney, Sr. Advisor for Generic Sales<br>Upsher-Smith<br>○ Mark Evenstad, CEO<br>○ Thomas Burke, Chief Operating Officer<br>○ Brad Leonard, Sr. Director of National Accounts<br>○ Scott Hussey, Sr. VP of Sales<br>○ Jim Maahs, VP of Commercial Portfolio Management<br>○ and Mike McBride, VP of Partner Relations |
| GPhA 2013 CMC Conference<br>June 4-5, 2013<br>Bethesda North Marriott Hotel & Conference Center, Bethesda, MD | ○ Teva<br>○ Actavis<br>○ Apotex<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Morton Grove<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz | Apotex<br>○ Kiran Krishnan Vice President, Regulatory Affairs<br>Dr. Reddy's<br>○ Nick Cappuccino, Vice-President & Head of Global Quality<br>Impax<br>○ Marcy Macdonald, Vice President Regulatory Affairs<br>Perrigo<br>○ Richard Stec, Vice President, Global Regulatory Affairs<br>Sandoz<br>○ Alison Sherwood, Associate Director, Regulatory Affairs |

A-3

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | ○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Zydus | |
| 2013 NACDS Total Store Expo<br>August 10-13, 2013<br>Sands Expo Convention Center, Las Vegas, NV | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | **Teva**<br>○ Theresa Coward, Senior Director of Sales<br>○ David Rekenthaler, Vice President, Sales<br>○ Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics<br>○ Kevin Galowina, Head of Marketing Operations<br>○ Jessica Peters, Manager of Corporate Accounts<br>○ Allan Oberman, President and CEO **Teva** Americas Generics<br>**Actavis**<br>○ Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts)<br>○ Marc Falkin, Vice President (Marketing, Pricing and Contracts)<br>**Breckenridge**<br>○ Larry Lapila, President<br>**Heritage**<br>○ Matthew Edelson, Senior Director of Sales<br>○ Jeffrey A. Glazer (then CEO and Chairman),   ○     Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President)<br>○ Gina Gramuglia, Commercial Operations<br>○ Neal O'Mara, Senior Director, National Accounts<br>○ Anne Sather, Senior Director, National Accounts<br>**Mylan**<br>○ Mike Aigner, Director National Accounts<br>○ Kevin McElfresh, Executive Director National Accounts<br>○ Joe Duda, President<br>○ Robert Potter, Senior Vice President North America National Accounts<br>○ Rob O'Neill, Head of Sales<br>○ Lance Wyatt, Director National Accounts<br>**Par**<br>○ Jon Holden, Vice President of Sales<br>○ Renee Kenney, Senior Advisor Generic Sales<br>○ Karen O'Connor, Vice President National Accounts<br>○ Lori Minnihan, Manager, Pricing & Analytics<br>○ Warren Pefley, Director, National Accounts<br>○ Charles "Trey" Propst, Vice President, National Accounts<br>○ Michael Reiney, Vice President, Sales<br>○ Jeremy Tatum, Demand Manager<br>**Upsher-Smith**<br>○ Scott Hussey, Senior Vice President, Sales |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Brad Leonard, Senior Director, National Accounts<br>○ Michael Muzetras, Sr. National Accounts Manager<br>○ Beth Pannier, Senior National Accounts Manager<br>○ Mary Rotunno, National Accounts Manager. |
| GPhA 2013 Fall Technical Conference<br>October 28-30, 2013<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Actavis<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | Apotex<br>○ Kiran Krishnan Vice President, Regulatory Affairs<br>Dr. Reddy's<br>○ Nick Cappuccino, Vice-President & Head of Global Quality<br>Impax<br>○ Marcy Macdonald, Vice President Regulatory Affairs<br>Mylan<br>○ Dan Snider, Vice President Morgantown RD<br>○ Marcie McClintic, Vice President & Chief of Staff<br>○ Carmen Shepard, Senior VP, Global Policy & Regulatory<br>Perrigo<br>○ Richard Stec, Vice President, Global Regulatory Affairs |
| 2013 NACDS NYC Week Annual Foundation Dinner<br>December 3, 2013<br>New York City | ○ **Teva**<br>○ Actavis<br>○ Mylan<br>○ Upsher-Smith | **Teva**<br>○ Theresa Coward, Senior Director of Sales<br>○ David Rekenthaler, Vice President, Sales<br>○ Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics<br>Actavis<br>○ Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts)<br>○ Marc Falkin, Vice President (Marketing, Pricing and Contracts)<br>Mylan<br>○ Joe Duda, President<br>○ Tony Mauro, COO<br>○ Robert Potter, Senior Vice President North America National Accounts<br>○ Rob O'Neill, Head of Sales<br>Upsher-Smith<br>○ Scott Hussey, Senior Vice President, Sales<br>○ Jim Maahs, Vice President, Commercial Portfolio Management<br>○ Mike McBride, Vice President Partner Relations |
| GPhA 2014 Annual Meeting<br>February 19-21, 2014<br>JW Marriott Orlando Grande Lakes, Orlando, FL | ○ **Teva**<br>○ Actavis<br>○ Apotex<br>○ Aurobindo | **Teva**<br>○ Allan Oberman, President & CEO<br>Apotex<br>○ Jeff Watson, President |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | ○ Breckenridge<br>○ Dr. Reddy's<br>○ Epic<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | Mylan<br>  ○ Marcie McClintic Coates, VP & Head of Global Regulatory Affairs<br>  ○ Andrea Miller, Senior Vice President, Head, Global Complex Products Operations<br>  ○ Tony Mauro, President<br>Sandoz<br>  ○ Carlos Sattler, M.D. Vice President, Clinical Development & Medical Affairs |
| 2014 NACDS Annual Meeting<br>April 26–29, 2014<br>The Phoenician Resort, Scottsdale, Arizona | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | **Teva**<br>  ○ Theresa Coward, Senior Director of Sales<br>  ○ David Rekenthaler, Vice President, Sales<br>  ○ Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics<br>  ○ Allan Oberman, President and CEO **Teva** Americas Generics<br>Actavis<br>  ○ Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts)<br>  ○ Marc Falkin, Vice President (Marketing, Pricing and Contracts)<br>Breckenridge<br>  ○ Larry Lapila, President<br>  ○ Brian Guy, Vice President, Business Development<br>  ○ Martin Schatz, Senior Vice President, Sales<br>Heritage<br>  ○ Jeffrey Glazer (then CEO and Chairman)<br>Mylan<br>  ○ Joe Duda, President<br>  ○ Tony Mauro, President<br>  ○ Robert Potter, Senior Vice President North America National Accounts and Channel Development<br>  ○ Rob O'Neill, Head of Sales<br>Par<br>  ○ Jon Holden, Vice President of Sales<br>  ○ Paul Campanelli, President<br>  ○ Renee Kenney, Senior Advisor Generic Sales<br>Upsher-Smith<br>  ○ Scott Hussey, Senior Vice President, Sales<br>  ○ Brad Leonard, Senior Director, National Accounts<br>  ○ Jim Maahs, Vice President, Commercial Portfolio Management<br>  ○ Mark Evenstad, CEO<br>  ○ Rusty Field, President |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| 2014 MMCAP National Member Conference<br>May 12-15, 2014<br>Bloomington, MN | ○ Teva<br>○ Actavis<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Upsher-Smith | **Teva**<br>  ○ Nick Gerebi, National Account Manager<br>**Actavis**<br>  ○ Mark Blitman, Executive Director of Sales for Government Markets<br>**Breckenridge**<br>  ○ Scott Cohon, National Accounts Director<br>**Heritage**<br>  ○ Anne Sather, Director, National Accounts<br>**Mylan**<br>  ○ Jan Bell, Director, National Accounts<br>**Upsher-Smith**<br>  ○ Michelle Brassington, Regional Account Manager. |
| 2014 HDMA Business and Leadership Conference<br>June 1-4, 2014<br>JW Marriott Desert Ridge, Phoenix, AZ | ○ Actavis<br>○ Mylan<br>○ Upsher-Smith | **Actavis**<br>  ○ Anthony Giannone, Exec. Director Sales<br>**Mylan**<br>  ○ Lance Wyatt, Director, National Accounts<br>  ○ Richard Isaac, Senior Manager, Strategic Accounts<br>**Upsher-Smith**<br>  ○ JoAnn Gaio, Sr. National Account Manager, Trade<br>  ○ Scott Hussey, Senior Vice President, Global Sales<br>  ○ Jim Maahs, Sr. Director<br>  ○ Michael (Mike) McBride, Associate Vice President, Partner Relations<br>  ○ Mike Muzetras, Senior National Accounts Manager<br>  ○ Doug Zitnak, National Accounts Senior Director – Trade |
| GPhA 2014 CMC Conference<br>June 3-4, 2014<br>Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva**<br>○ Actavis<br>○ Apotex<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Hi-Tech<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Morton Grove<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ Zydus | **Teva**<br>  ○ Scott Tomsky, Generic Regulatory Affairs, North America<br>  ○ Siva Vaithiyalingam, Director, Regulatory Affairs<br>**Apotex**<br>  ○ Pradeep Sanghvi, Executive Vice President, Global R&D<br>  ○ Kiran Krishnan, Vice President, Regulatory Affairs<br>  ○ Chetan Doshi, Director of Formulation Development - Solid Dose<br>**Impax**<br>  ○ Marcy Macdonald, Vice President Regulatory Affairs<br>**Mylan**<br>  ○ Dan Snider, Vice President Morgantown RD<br>**Perrigo**<br>  ○ Richard Stec, Vice President, Global Regulatory Affairs |
| 2014 NACDS Total Store Expo<br>August 23-26, 2014<br>Boston Convention Center, MA | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | **Teva**<br>  ○ David Rekenthaler, Vice President, Sales<br>  ○ Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics<br>  ○ Kevin Galowina, Head of Marketing Operations |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Jessica Peters, Manager of Corporate Accounts<br>○ Nisha Patel, Director of National Accounts<br>**Actavis**<br>○ Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts)<br>○ Marc Falkin, Vice President (Marketing, Pricing and Contracts)<br>○ Richard Rogerson, Executive Director (Pricing & Business Analytics)<br>**Breckenridge**<br>○ Larry Lapila, President<br>○ Martin Schatz, Senior Vice President, Sales<br>**Heritage**<br>○ Heather Beem, National Account Manager, Institutional<br>○ Katie Brodowski, Associate Director Institutional Sales<br>○ Matthew Edelson, Senior Director of Sales<br>○ Jeffrey A. Glazer (then CEO and Chairman)<br>○ Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President)<br>○ Gina Gramuglia, Commercial Operations<br>○ Neal O'Mara, Senior Director, National Accounts<br>○ Anne Sather, Senior Director, National Accounts<br>**Mylan**<br>○ Joe Duda, President Mylan Pharmaceuticals<br>○ Robert Potter, Senior Vice President North America National Accounts and Channel Manager<br>**Par**<br>○ Jon Holden, Vice President of Sales<br>○ Renee Kenney, Senior Advisor Generic Sales<br>○ Lori Minnihan, Manager, Pricing & Analytics<br>○ Warren Pefley, Director, National Accounts<br>○ Charles "Trey" Propst, Vice President, National Accounts<br>○ Michael Reiney, Vice President, Sales<br>○ Jeremy Tatum, Demand Manager<br>**Upsher-Smith**<br>○ Scott Hussey, Senior Vice President, Sales<br>○ Brad Leonard, Senior Director, National Accounts<br>○ Jim Maahs, Vice President, Commercial Portfolio Management |
| 2014 HCSCA LogiPharma Supply Chain Conference<br>September 16-18, 2014<br>Princeton, NJ | ○ **Teva**<br>○ Actavis | |
| GPhA 2014 Fall Technical Conference<br>October 27-29, 2014 | ○ **Teva**<br>○ Actavis | **Teva** |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Fougera<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ UDL (Mylan Institutional)<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | ○ Scott Tomsky, Generic Regulatory Affairs, North America<br>Actavis<br>○ Michael Kimball, Executive Director, Transdermal Development<br>Apotex<br>○ Kiran Krishnan, Vice President, Regulatory Affairs<br>Impax<br>○ Marcy Macdonald, Vice President Regulatory Affairs<br>Mylan<br>○ Marcie McClintic Coates, Vice President & Head of Global Regulatory Affairs<br>Perrigo<br>○ Richard Stec, Vice President, Global Regulatory Affairs |
| 2014 IGPA Annual Conference<br>November 19-21, 2014<br>Ritz-Carlton, Key Biscayne, Miami, FL | ○ **Teva**<br>○ Actavis<br>○ Apotex<br>○ Dr. Reddy's<br>○ Mylan<br>○ Sandoz | **Teva**<br>○ Allan Oberman, President & CEO, **Teva** Americas Generics<br>○ Yehudah Livneh, Ph.D., Vice President, Global Public Policy, Asia and EMIA<br>Actavis<br>○ David Buchen, Executive Vice President, Commercial North American Generics and International<br>○ Shawn Brown, Esq., Vice President, International Government Affairs<br>Apotex<br>○ Jeremy Desai, Ph.D., President & CEO<br>Dr. Reddy's<br>○ Nicholas Cappuccino, Jr., Ph.D., Vice-President and Head of Global Quality<br>Mylan<br>○ Rajiv Malik, President<br>○ Nawel Bailey Rojkjaer, Senior Director, International Affairs, Office of Global Policy<br>Sandoz<br>○ Peter Goldschmidt, President of Sandoz US and Head of North America<br>○ Nick Haggar, Head of Western Europe, Middle East & Africa |
| 2014 NACDS NYC Week Annual Foundation Dinner<br>December 3, 2014<br>New York City | ○ **Teva**<br>○ Actavis<br>○ Mylan | **Teva**<br>○ Theresa Coward, Senior Director of Sales<br>○ David Rekenthaler, Vice President, Sales<br>○ Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics<br>○ Jessica Peters, Director National Accounts<br>Actavis<br>○ Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts) |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Marc Falkin, Vice President (Marketing, Pricing and Contracts)<br>○ Brent Saunders, President, CEO and Chairman<br>**Mylan**<br>○ Mike Aigner, Director National Accounts<br>○ Robert Potter, Senior Vice President North America National Accounts and Channel Development<br>○ Tony Mauro, COO |
| GPhA 2015 Annual Meeting<br>February 9-11, 2015<br>Fontainebleau Miami Beach, Miami, FL | ○ **Teva**<br>○ Actavis<br>○ Akorn<br>○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Dr. Reddy's<br>○ Epic<br>○ Glenmark<br>○ Heritage<br>○ Impax<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Taro<br>○ Teligent (IGI Laboratories)<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | **Teva**<br>○ Sigurdur Olafsson, President & Chief Executive Officer, Global Generic Medicines Group<br>○ Brian Rubenstein, Executive Counsel<br>**Apotex**<br>○ Jeff Watson, President<br>**Mylan**<br>○ Rajiv Malik, President<br>○ Deborah Autor, Senior Vice President, Strategic Global Quality & Regulatory Policy<br>**Perrigo**<br>○ Joseph Papa, President, Chief Executive Officer & Chairman |
| 2015 HCSCA National Pharmacy Forum<br>February 16-18, 2015<br>Tampa, FL | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Mylan | **Teva**<br>○ Nick Gerebi, Director of National Accounts<br>○ Jeff McClard, Sr. Director of National Accounts<br>○ Cam Bivens, Director of National Accounts<br>○ and Brad Bradford, Director of National Accounts<br>**Actavis**<br>○ John Fallon, Executive Director of Sales<br>**Breckenridge**<br>○ David Giering, Marketing and Trade Relations Manager<br>**Mylan**<br>○ Lee Rosencrance, District Manager<br>○ Martin Wingerter, Director of National Accounts<br>○ Jan Bell, Director of National Accounts<br>○ Heather Paton, VP of Institutional Sales<br>○ and Mark Pittenger, Sr. Director of National Accounts |
| 2015 NACDS Annual Meeting<br>April 25-28, 2015<br>The Breakers Resort, Palm Beach, FL | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | Unidentified "executives, senior management, and salespeople" |
| 2015 HDMA Business & Leadership Conference | ○ **Teva**<br>○ Actavis | **Teva** |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| June 7-10, 2015<br>JW Marriott San Antonio Hill Country,<br>San Antonio, TX | ○ Apotex<br>○ Aurobindo<br>○ Breckenridge<br>○ Citron<br>○ Dr. Reddy's<br>○ Heritage<br>○ Impax<br>○ Lannett<br>○ Lupin<br>○ Mylan<br>○ Par<br>○ Sandoz<br>○ Sun<br>○ Upsher-Smith<br>○ Wockhardt<br>○ Zydus | ○ Christine Bader, Vice President, Commercial Operations<br>○ Brad Bradford, Director National Accounts<br>○ Theresa (Teri) Coward, Senior Director of National Sales<br>○ Christopher (Chris) Doerr, Senior Director, Trade Operations<br>○ Cassie Dunrud, Associate Director<br>○ Nick Gerebi, Director National Accounts<br>○ Jeff Herberholt, Senior Manager, Regional Accounts<br>○ Jeff McClard, Senior Director National Accounts<br>○ Jason Nagel, Associate Director, Trade Relations<br>○ Michelle Osmian, Director, Customer Operations<br>○ Nisha Patel, Director, National Accounts<br>○ Jessica Peters, Director, National Accounts<br>Actavis<br>○ Andrew Boyer, Sr. VP Generic Sales & Marketing<br>○ Marc Falkin, VP Marketing, Pricing & Contracts<br>○ Anthony Giannone, Exec. Director Sales<br>○ Brandon Miller, Exec. Director, Trade Relations<br>○ Michael Reed, Director, National Trade Accounts<br>Apotex<br>○ Sam Boulton, Director National Account<br>○ John Crawford, Director National Account<br>○ Beth Hamilton, VP Sales & Marketing<br>○ Jeff Hampton, Sr. VP, Commercial Operations<br>○ Tina Kaus, Director National Account<br>○ Erin Organ, Director, Commercial Operations<br>○ Jim Van Lieshout, VP Market Access & Pharm. Strategy<br>○ Debbie Veira, Manager, National Accounts<br>Aurobindo<br>○ Julia Faria, Sr. Manager, Sales Operations & Contract Admin.<br>○ Charles Rath, National Trade Relations Manager<br>Breckenridge<br>○ Scott Cohon, Director of Sales<br>○ David Giering, Manager, marketing & Trade Relations<br>○ Philip Goldstein, Director of National Accounts<br>Citron<br>○ Susan Knoblauch, Director National Accounts<br>○ Laura Short, Vice President of Sales<br>○ Karen Strelau, EVP of Sales & Marketing<br>Dr. Reddy's<br>○ Jake Austin, Director, National Accounts Rx Generics |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Victor Borelli, Sr. Director, head of National Accounts Rx Generics<br>○ Sherice Koonce, Director, Rx Pricing<br>○ Katherine Neely, Director, National Accounts<br>○ Patricia Wetzel, Sr. Director, National Accounts<br>Heritage<br>○ Matthew Edelson, Associate Director, National Accounts<br>○ Jeff Glazer, CEO & Vice Chairman<br>○ Jason Malek, Senior VP Commercial Operations<br>○ Neal O'Mara, Director, National Accounts<br>○ Anne Sather, Director, National Accounts<br>Impax<br>○ William Ball, Senior National Sales Manager<br>○ Danny Darnell, Senior National Accounts Manager<br>○ Todd Engle, VP, Sales & Marketing<br>○ Michael Grigsby, Senior National Accounts Manager<br>○ Italo Pennella, Trade Account Manager<br>○ Thomas Sammler, Director, Sales Operations<br>○ Gary Skalski, Senior Director Sales<br>Lannett<br>○ Kevin Smith, Sr. VP of Sales & Marketing<br>○ Breanna Stillman, Sales Analyst<br>○ Tracy Sullivan, Director of National Accounts<br>○ Grace Wilks, Director of National Accounts<br>Lupin<br>○ David Berthold, VP of Sales, US Generics<br>○ William Chase, Director, Managed Markets & Trade (Brand)<br>○ Jason Gensburger, Director, Financial Services<br>○ Kevin Walker, National Account Manager<br>○ Lauren Walten, Regional Sales Associate<br>Mylan<br>○ Todd Bebout, VP of Sales, Vice President – NA Supply Chain Management<br>○ Janet Bell, Director National Accounts<br>○ Richard Isaac, Senior Manager, Strategic Accounts<br>○ Stephen Krinke, National Account Manager<br>○ Rob O'Neill, Head of Sales Generic, NA<br>○ Sean Reilly, National Account Manager<br>○ Erik Williams, VP NA Pricing<br>○ Lance Wyatt, Director, National Accounts<br>Par<br>○ Karen O'Connor, Vice President, National Accounts<br>Sandoz<br>○ Ken Baker, Director, Managed Markets |

| MEETING / CONFERENCE DATE LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | | ○ Christopher Bihari, Director of National Accounts (Sales) |
| | | ○ Seth Coombs, Executive Director, Oncology Injectables |
| | | ○ Steven Greenstein, Director of National Accounts (Sales) |
| | | ○ Anuj Hasija, Executive Director Key Customers |
| | | ○ Jason Jones, Director of Key Customers |
| | | ○ Kirko Kirkov, Executive Director Key Customers |
| | | ○ Marco Polizzi, Head, Institutional Sales & Marketing |
| | | ○ Arun Varma, Executive Director Marketing |
| | | ○ Sean Walsh, Key Account Manager |
| | | **Sun** |
| | | ○ Daniel Schober, VP Trade Sales |
| | | ○ Steve Smith, Sr. Director Sales |
| | | **Upsher-Smith** |
| | | ○ JoAnn Gaio, Senior National Account Manager, Trade |
| | | ○ Scott Hussey, Senior Vice President, Global Sales |
| | | ○ Brad Leonard, Senior Director, National Accounts |
| | | ○ Michael (Mike) McBride, Associate Vice President, Partner Relations |
| | | ○ Mike Muzetras, Senior National Accounts Manager |
| | | ○ David (Dave) Zitnak, National Accounts Senior Director – Trade |
| | | ○ Doug Zitnak, National Accounts Senior Director – Trade |
| | | **Wockhardt** |
| | | ○ Karen Andrus, Director of Sales |
| | | ○ Scott Koenig, Vice President, Retail Generics |
| | | **Zydus** |
| | | ○ Maria Bianco-Falcone, Director of Offer Development & Trade Operations |
| | | ○ Scott Goldy, Sales Director |
| | | ○ Kevin Green, Senior Director of Sales |
| | | ○ Maria McManus, Corporate Account Manager |
| | | ○ Louis Pastor, Senior Director, Trade Operations |
| | | ○ Kristy Ronco, Vice President, Sales |
| | | ○ Jodi Weber, Corporate Account Manager |
| GPhA 2015 CMC Conference June 9-10, 2015 Bethesda North Marriot Hotel & Conference Center, Bethesda, MD | ○ **Teva** ○ Actavis ○ Apotex ○ Citron ○ Dr. Reddy's ○ Fougera ○ Glenmark ○ Heritage ○ Impax ○ Lannett ○ Lupin ○ Mylan | **Teva** ○ Scott Tomsky, Generic Regulatory Affairs, North America ○ Siva Vaithiyalingam, Director, Regulatory Affairs **Actavis** ○ Joyce Anne DelGaudio Executive Director, Regulatory Affairs **Apotex** ○ Kiran Krishnan, Vice President, Regulatory Affairs **Impax** |

| MEETING / CONFERENCE<br>DATE<br>LOCATION | CORPORATE ATTENDEES | INDIVIDUAL ATTENDEES |
|---|---|---|
| | ○ Par<br>○ Perrigo<br>○ Sandoz<br>○ Sun<br>○ Taro<br>○ UDL (Mylan Institutional)<br>○ Upsher-Smith<br>○ West-Ward<br>○ Wockhardt<br>○ Zydus | ○ Marcy Macdonald, Vice President Regulatory Affairs<br>Mylan<br>○ Bryan Winship, Senior Director, Quality Management, Strategic Global Quality & Regulatory Policy<br>○ Daniel Snider, Vice President, Research & Development<br>○ Timothy Ames, Vice President, Global Strategic Regulatory Affairs<br>○ Dawn Culp, Vice President, Global Regulatory Affairs Policy<br>Perrigo<br>○ Richard Stec, Vice President, Global Regulatory Affairs<br>Sandoz<br>○ Nicholas Tantillo, Head, Policy & Regulatory Strategy |
| 2015 NACDS Total Store Expo<br>August 22-25, 2015<br>Colorado Convention Center, Denver | ○ **Teva**<br>○ Actavis<br>○ Breckenridge<br>○ Heritage<br>○ Mylan<br>○ Par<br>○ Upsher-Smith | |

## APPENDIX C
## <u>Graphs of Collusive Price Increases</u>

**a.**   **Pravastatin Sodium**



**b.**   **Enalapril Maleate**



**c.    Cephalexin Oral Suspension**



**d.    Ketoconazole Tablets and 2% Cream**



**e.    Baclofen Tablets**



**f.** **0.05% Fluocinonide**



**g.** **Carbamazepine Tablets and Chewable Tablets**



**h.** **Estradiol Tablets**



**i.      Clobetasol Propionate Topical Cream**



**j.      Diclofenac Potassium Tablets**



**k.      Glyburide Micronized**



**l.     Desonide Topical Lotion and External Cream**



**m.     Doxycycline Hyclate Capsules**



**n.     Propranolol Hydrochloride**



**o.**    **Tretinoin External Cream**



**p.**    **Ursodiol Capsules**



**r.**    **Nystatin**



**s.**     **Theophylline ER**



Source: Symphony Health Solutions

**t.**     **Propranolol Tablets**